Good morning. May it please the Court, my name is Felicia Boyd. I'm from Barnes & Thornburg in Minneapolis, total awe of the chambers, and I represent the appellants, Wells Fargo & Company and Wells Fargo Insurance Services USA. I'd like to reserve five minutes for rebuttal if that's appropriate with the Court. Your Honor, this is a very unusual case. It's a case of intentional theft of another company's identity, name, reputation, and goodwill. Faced with evidence of intentional taking of that goodwill, the district court declined to stop that very activity, but only because she applied the wrong law. That constitutes an abuse of discretion and requires reversal and remand for appropriate consideration of the legal standards on this preliminary injunction, Your Honor. It's an unusual case, because here the district court actually found on the record that the defendants intentionally selected and adopted a name that was identical to the ABD Financial Insurance Services name for the purpose of inducing confusion and misleading consumers. So how did this mistake occur? Well, there are two main claims up for consideration here before the Court. One would be the false advertising count. This is a false advertising count under the 43, Section 43A of the Lanham Act, 43A1B. This is a false association count. It's not a trademark infringement count. Having a trademark... It stands alone, right? It stands alone. What's at the core of that claim? The core of the claim is that you are falsely holding yourself out as being associated with another entity. And the step is the task is set forth in the Skydive Arizona case as well as the traffic school case. And you're having representations which all imply a false association and attempt to ride on another corporation's goodwill. And the statements here that were made, which were laid out in great detail in the briefs and brought out in discovery, included things like we're relaunching ABD. ABD is back. ABD 2.0, allow us to introduce ourselves or reintroduce ourselves. We're ABD. I wanted to let you know, we've decided to bring back our company and we have relaunched ABD. On this claim, the district court said, as I recall, that the core, that the heart of the false advertising claim was essentially the same as the trademark infringement claim. That's correct. And that's where the error occurred. The district court in the decision that page, it's ER7 of the record, she lumped those together and said that the heart of the claim was duplicative of the infringement claim and may ultimately have merit, but it's derivative of a trademark infringement claim in the applicable law. And it's not. I mean, the law is completely different. There's no abandonment. What about the facts, though? No, the facts are different, because you don't need to have a trademark. You don't need abandonment. It's not a role. You're looking at the statements that were made and whether or not those statements have a tendency to deceive or have deceived customers. And the test is set forth in the Southland Sod Farms case. Completely different test, completely different standard. And I believe the defendants concede that in their brief, that they did, that the judge did not do it right. Instead, they advocate that, well, it was good enough. You know, let's just pick and choose from the portions of the opinion that the judge did rule on, and let's just create an argument of no violation. And we can't do that. Let me ask, if I may, a practical question. Will there come a point in time when it is clear that Wells has abandoned the use of ABD? Well, they haven't abandoned the use. Well, will there come a time? If, in fact, there comes a time where they stop use of the mark, bona fide use of the mark, then there would be abandonment. Your position is that that had not occurred at the time the VI was requested, and that remains the case today? That is correct. So it's not like there's a contractual date out in the future when it's abandoned? No, not at all. In fact, what you have to do is to the next error, which I think is really important, and that would be with respect to the trademark infringement claim here and the abandonment analysis that was done by the district court. It's contrary to the electrosource case and what the standard actually is. You have to look at actual cessation of use, followed by if there is cessation of use, an intent to resume the mark. In this case, her prism of viewpoint is completely upside down. What she did instead, contrary to electrosource, was look at a prospective intent to abandon the mark. She focused unnecessarily on a 2009 corporate memo to rename the AVD finance and insurance services division. That was out there in 2009. And what happened after that prospective announcement was made? They kept using. The sales force kept using. And that's because, you know, you look at a large company, and you might have one executive that thinks one thing. And it's prospective, but what actually happens is what matters. And that's what this Court has recognized more than once, is you do not look at intent, because people can change their mind. And when you look at what the uses are here and the number of uses here, hundreds of ongoing uses that she did not examine appropriately, she went through them in a serial fashion through the lens of it's already gone and is there any use, and then she played a game of, like a whack-a-mole. Any use that was presented, she would discount or toss aside using exceptions of, oh, that's a residual use, or that's a historic use. So at the end of the day... Counsel, one more. Could I ask you, just identify what you think are the, say, three or four most significant uses by Wells Fargo of the APD name that are still ongoing, or that were ongoing when the District Court had this, and that, as I understand you today, are still ongoing? Yes, Your Honor. The record shows that since 2009, the salespeople on the ground did customer presentations in order to get business to sell their insurance services. And as part of those presentations, they would tout ABD Finance and Insurance. And the logos would appear and the name would appear in those presentations in order to encourage consumers to select them as their insurance broker versus another one. And there were at least a dozen of those submitted to the court for review. We also have ongoing use on our website, on the Wells Fargo website, where they talk about the ABD division of the company, and they have metatag use, they have emails that continue to direct or use by the salespeople for the customers. And then you also have, interestingly, with broker of record letters in place, you have people sending Wells Fargo checks made out to ABD Finance and Insurance every month. And we process those checks. We are, to every one of those customers, ABD Finance and Insurance Services. And those checks continue to come in every day. That property belongs to Wells Fargo. It can decide how it wants to use that trademark. It's not a question of can someone do a better use or make more money of it. It's our asset. It's valued at more than $270 million when we purchased it. And it's unheard of that someone could come in and just take it because they think they can do a better job. And you look at the test. But didn't Wells Fargo let it lapse or whatever at the trademark office? No. The Federal Trademark Registration was intentionally set aside because it's a regional brokerage, and they wanted to focus the region, the division on that region, rather than a national practice. And as the district court properly found, and quite expressly found, the presence of a trademark registration was of no moment in her analysis here. Let me ask you this. So at the end of your discussion, and one the district court followed, she concluded that the defendants were likely to prevail on their abandonment claim. And then she said, well, from that, plaintiffs are unlikely to prevail on their trademark. That's correct. But then she went on and did a trademark sleep factor craft analysis, focusing on three primary factors. She did do that, Your Honor. Where did she go? You know, we could still affirm her if we found that her analysis there was proper. We could affirm her on that basis. With her analysis there was improper. Why? For several reasons. First, the abandonment inquiry also colored her review of the sleep craft factors. You notice there's no discussion there about the primary sleep craft factor of the strength of the mark and the validity of the mark. So that's the first one. That would be an error. You also look at her treatment of the evidence of actual confusion, which she mishandled in two material ways. One, she imposed a temporal limitation on the evidence that was provided. It's unusual to actually have evidence of customer confusion. And we came in with lots of evidence of actual confusion. She discounted it in two ways. One, she said, yeah, okay, you have customer confusion, but it's limited in time. And we moved very fast, and we went to briefing within three months. So it's limited in time, therefore, it is not of particular significance. And two, I'm not going to consider the non-consumer confusion evidence, which this is also relevant to the inquiry. That was an abuse of discretion on a very material factor. And when you put in the evidence of confusion, along with her finding intent, identical goods, identical chambers, competing business, ongoing use, that balance would dictate a finding of likelihood of confusion, which she thought would be the case at the hearing, after hearing the oral arguments at the beginning. She offered.    And that's a reason. But when the case began, did Wells have a cross-affiliation claim? Yes. In the complaint, as well as in the proposed order that was submitted to her, it was raised. Has that been raised on appeal? It was raised in our appeal brief, yes. Where? I think it was in our brief in the year. In your opening brief? In our opening brief. But it wasn't really raised before the district court. That's the problem. I believe it was raised below the district court. It could have raised it better. Yes. You're arguing. It's in the proposed order. It's an affiliation claim in the proposed order. I have the brief that was filed in the district court right here, and I looked high and low for it. You have to dig. You have to dig deeply. But, you know, it is a claim in this case. It's in the complaint. It will be tried. And the question then will be what is going to be the law governing that test. You know? And you look at all of these factors here on the sleep craft and how they were not handled appropriately, and it should be remanded. What are you asking for? We would like the case remanded for her to redo the sleep craft analysis, as well as we need guidance as to what actually is the law of abandonment here. This is going to go to trial. And we don't need to have this prospective intent document coloring the analysis. If you took away that document and looked at every one of those uses, there would be no question that those were actual bona fide uses pursuant to the statute. I thought in the electric source we pretty much laid out how you look at abandonment. I agree with you, Your Honor, and that was not what was followed below. All right. The final point I'd like to make here is that. Your time is running out. Yes. The final point I wanted to make was about the irreparable harm. When she did the sleep craft analysis, she tipped into irreparable harm and found that there would be some way for us to track money damages, and that's inappropriate. This is a case of trademark and brand theft. Incalculable damage, very difficult for us to actually prove damages, and the irreparable harm inquiry was done incorrectly. Was there a bond? No. Okay. Thank you. I don't think so. Good morning, Your Honors. May it please the Court. I'm Ben Riley, appearing for the defendants, the ABD team, Kirk DeGrosse and Brian Hetherington. As Your Honors have mentioned, the standard here is abuse of discretion. We have a very well-respected trial judge. She held a long hearing. I think it was a 45-minute to an hour hearing. She took a long time to issue the decision. She wrote a very careful decision. And I think under the U.S. versus Hinkson standard, a denial of a preliminary injunction is only reversed if the district court's decision is based on an erroneous legal standard or clearly erroneous findings of fact. And we know, replete through this record, Judge Hamilton looked at the Winter case, which is the standard for a preliminary injunction, and she looked very closely at the electrosource and the ‑‑ She didn't really think electrosource really was the guiding ‑‑ well, I don't want to say that, but she didn't put a lot of weight on it. She quoted from it extensively in terms of the test, like Your Honor said, and setting it forth. And looked at some related district court opinions. Correct. She said that is a summary judgment case where all the inferences go in favor of the plaintiff. I'm on preliminary injunction. And so ultimately, yes, the most persuasive case to her was the Cascade case, which of course was on preliminary injunction, a district court working hard, doing its job. And very similar facts in that case. So if you ‑‑ so just ‑‑ Yes, sir. Just because the standard is abuse of discretion, if there is legal error, that amounts to abuse of discretion. As counsel was arguing at the outset, the district court, in analyzing the false advertising claim, basically conflated it with the ‑‑ with the ‑‑ Infringement. With the infringement claim. She ‑‑ And they're really ‑‑ they are distinct claims. You don't need a trademark for the false advertising claim. No. That's right. Why isn't there just error there? Because what the court did was proper, because she said basically a common sense approach, if you will, that the heart of the false advertising claim is the same as trademark infringement. It's the idea that this new company is holding itself out as ABD Financial and Insurance Services. And in fact ‑‑ You mean the original? Yeah. Correct. As that name, which Wells Fargo was claiming as its own, both in terms of a trademark and also in terms of false advertising, a false statement of fact is what they were alleging. And in fact, contrary to what counsel is saying, if you look at Southland Sod, the test under the two is very similar to the Sleekcraft factors. Three of the factors I submit are identical. Sleekcraft looks at the fourth factor, looks at actual customer confusion. The Sod case looks at customer deception. Sleekcraft looks at whether the sophistication of the parties making the decision. The Sod case looks at materiality. And finally, Sod looks at damages. Judge Hamilton found on each of those points absence of customer confusion. She said they had some alleged confusion in the first week or two, but after that, nothing. The Court did not apply a temporal limit. It's just Wells Fargo had no evidence after the first week or two. She said, on this record, I don't find customer confusion, don't find any customer deception. In fact, the only customer evidence, Your Honor, submitted on this record was from ABD. In fact, including the Pixar e-mail, totally unsolicited, said, hey, Wells Fargo wants my business, but I value you as individuals more as brokers. And I want to say, yes, sir. You did look carefully at the fact that you're dealing with very sophisticated customers here. Right. And that goes to the materiality factor under the Southland Sod case. So we know exactly what she was saying and exactly the factual findings that preclude false advertising. And she went further than that. She said, I don't find any causal connection between any of the alleged wrong and alleged damages. Yes, sir. It's a little difficult in this case, hard as it may be to feel sorry for a major financial institution like Wells Fargo. It is a little hard to say, isn't it, that the equities lie in your client's favor when Wells paid north of $250 million for this company and that the, what was it, the sons and daughters of the people who ran it originally go out and start using the name and soliciting customers? It sounds to me like the equities weigh in favor of Wells. No, I don't. Tell me why I'm wrong. I don't think so, Your Honor. First of all, you have to understand that the original ABD Financial Services company was purchased originally by Greater Bank Corp. in 2002. It was allowed to be a separate company. It was only in 2007 when Wells purchased Greater Bank Corp. that the ABD Financial Services part of Greater Bank Corp. came along. Are you saying that ABD wasn't part of the deal? No, I'm saying they were part of the deal, but they were a small part of the deal of a major, I think it was a couple billion-dollar transaction. And the fact is that as soon as they received the ABD, as soon as that merger was completed, the record is replete. It's not just one document. Over and over, e-mails and other documents, we will no longer use ABD. It's going to retire. Counsel, if I could ask you a question on the point you're arguing right now. Yes, sir. Correct me if I'm wrong, but that seems to me not to be very relevant if they say we're not going to use the name and we're going to rebrand it Wells Fargo Insurance. If they own the asset, if they own the name ABD, why isn't it their choice if they want to market under a Wells Fargo name and still not be attacked by a competitor using the name that they own? Because this is a quasi-public name. It's a trademark. First of all, it's a trademark they had from the United States Trademark Office, which they decided to let lapse. Secondly, it's a right they had to use that name with the California Department of Insurance. They can only use the ABD DBA if they have permission from the Department of Insurance. They let that lapse. So they legally couldn't even use ABD to sell insurance after April 2009. And so the point is that the equities, and the other point I wanted to make, Your Honor, is that a trademark takes it out of the public commercial use. In trademark, you have to use it or you lose it. You can't park a mark. That's in Section 1127 of 15 U.S.C. It says you need to make bona fide use of a trademark to continue it. And you can't use it just for purposes of retaining the rights and the mark. Judge Hamilton. So how do you deal with the appellant's arguments about the ways they did continue, they assert to use the mark? Exactly, Your Honor. And your question is exactly right. And that's what Judge Hamilton did, too. She looked at Exhibits C, D, E, and F to the Lane Declaration, which are the presentations and other things that Ms. Boyd references. And first of all, there were hundreds of presentations produced in this record. And they look at, you know, as she says, 10 or 12 of them. And what they are are, in the footnote of the presentation, the words ABD insurance with the expired license number, which they couldn't use anymore. They are testimonials from customers back when it was a separate company, ABD, saying we worked with ABD and we like them. They are parentheticals that say formerly ABD. Same thing at the website. They mention the use on the website. The use on the website is on the history page that says, in 2007 we acquired Greater Bank Corp., which included ABD. The use of the trademark in this case is Wells Fargo. It's the stagecoach. It's one of the most powerful trademarks in the world. There is no trademark use of ABD on this record. An old business card with an old address and an old telephone number, an old fax number, a website that immediately directs you to A2 Wells Fargo without any mention of ABD. If you contrast it with the Pelican case, the electrosource case, the guy is selling backpacks with a pelican on it, both in a symbol and a name. And the Court said, no, there is no cessation of use because he continues to sell the pelicans. Doesn't sell very many. He sold 79 his last year before it was challenged out of the backseat of his car. But he continued to sell pelicans, not as a secondary brand, not as a footnote brand. In this case, Judge Hamilton looked hard at the uses that were alleged and found those are not trademark uses. Those are not trademark uses. And I think if this Court does, it will find she did not abuse her discretion in that regard. If I can return to the false advertising point. As I say, the three major findings the judge made also preclude the false advertising and they go to the sleek craft factors. And the judge specifically found these are very, very knowledgeable consumers, Yahoo, Pixar. They knew that this small ABD company was not Wells Fargo. No one was confused in this situation. Did the district court find that Wells had ceased all use of the name? The district court found that Wells had ceased use of the ABD name for bona fide trademark purposes. Absolutely. That's what the court did. My question was all use. There's no doubt that customers sent checks in with the ABD name on it. We have record evidence, though, that they weren't supposed to. The name of the company, as you know from the merger documents, was Wells Fargo Insurance Services. So there were stray, remnant, residual ABD letters in certain places. But they were not used intentionally by the company to trademark or brand its services. Let me try it this way. Yes, sir. She engaged in an analysis for purposes of deciding whether to issue a preliminary injunction of the trademark infringement claim, correct? Correct. And part of that was her analysis of whether there had been abandonment. Correct, yes. And she found that there was abandonment? No. This is obviously preliminary. Right. I only say that because we have to – it's a preliminary injunction standard, right? So what she found was that it's likely that ABD will prevail on its abandonment defense. Hence, it's unlikely they will prevail, so she denied the preliminary injunction. It's all preliminary. If we go to trial, then we'll be trying those issues. Your Honors, if I can mention two other points. One thing I think is very important for the panel to focus on is irreparable injury. In this circuit, there was a law – there was law that presumed probable irreparable injury in trademark cases. The flexible lifeline case in copyright looked at that and rejected that and followed the eBay and the Winter case. And I think the leading district court case is the Groupion case, which finds that you have to have real significant – you have to have real significant and actual – real imminent and significant irreparable injury. Trying to square this with your earlier argument about how sophisticated these clients were, Pixar, Yahoo, et cetera, and that what they really wanted to deal with was, if you will, the remnants of the old company. They were happy to deal with individuals they were familiar with and would have dealt with them, I'm inferring, if they had named this – their new company Delta and only used the word Delta. Okay. So how is there irreparable harm if the judge grants a preliminary injunction and says to your client, until we resolve all the issues in this case, don't use the name? Well, because the standard on preliminary injunction, especially on irreparable harm, is the promovence burden to prove irreparable harm to them. And they did not prove that. My question is, what's the harm to your client? If, in fact, the case is that these are sophisticated end users who are not relying upon ABD as a name, would prefer to deal with the sons and daughters of the people who started ABD, what's the harm to you? As a matter of fact, there's only two sons involved. There's lots of other people at ABD working hard with their clients. I was trying to be gender neutral. The harm to ABD, and we argued this in the district court, was it was a brand new startup company. It was out talking to clients. Wells Fargo was spreading a lot of what we thought was false information in the market. And that if they were forced to change their name right out of the gate, it would have cost a lot of money and it would have threatened their very business. Absolutely would not have been status quo. It would have shut them down. I see I have very few, a couple seconds. You're actually over. Yes, you're over your time. Okay, Your Honors. Thank you. Thank you, Your Honors. Appreciate it. Thank you, Your Honors. You're right. This is a rare case where a very large bank actually has the equities working in their favor. And what's interesting here is they did pay millions and millions of dollars for this asset. And today the defendants would have you believe that it was worth nothing. But the record shows something completely different. In fact, it shows that back in April of last year when they were making their plan and scheming with other employees and calling their new company ABD 2.0, they say in those documents that there's a ton of brand equity, there's goodwill to be had, and that they were going to take it. And that's what they did. This is not a case of abandonment. We are using that mark. The big red herring that the district court fell for and, as counsels argued here, is the Department of Insurance in the State of California and the license number. That is only for a DBA. We're not operating a DBA called ABD Finance and Insurance, but we are using a trademark, and that trademark belongs to us. It's not on a backpack because it's a service mark. Service marks are shown in promoting the services, and that's what they did in customer presentations. The absence or presence of a wrong phone number or a wrong license number does not change the fact that it was being used and it was actually error for the court to discount every single use that was put up and say that there is actual abandonment of the mark. With respect to irreparable harm, when the court examined the sophistication of the customers and the very limited evidence that was actually put in from customers that were friendly to the defendant, saying, oh, I would have gone there anyways because I like Mr. DeGrosse, she then did the irreparable harm inquiry wrong. What she did is say, oh, look, we can track customer by customer and why they leave, and because you haven't shown a nexus between your losses, because the record is full of losses, but because you haven't shown a nexus between confused customers and the actual loss individually, that's calculable for damages later, and it means you haven't shown irreparable harm. But in a trademark case, irreparable harm is different. And that's why they took the name. And why they don't want to change their name here is because they want to continue to ride on our goodwill. They don't want to be a start-up company. They want a company with history. And that's why they took the name. Roberts. Okay. Counsel, could I ask you one clarifying question? Yes. Yes. As I understood your argument earlier, you are not asking us to reverse in the sense of directing her to issue an injunction. You're asking us to state the correct law and ask her to redo the analysis. Do I have that right? That's correct, Your Honor. I understand the Court has the power to direct her to do a preliminary injunction and enter it. But the relief that was requested was a remand so that she could apply the law that's clearly stated in electrosource as well as the law for the false advertising and false affiliation claims. Correct? Correct. Thank you. Thank you. Thank you, counsel. We appreciate your arguments on this case.  Have a safe trip back to Minneapolis. Is it Minneapolis? Thank you. That ends our session for today.
judges: Hawkins, Gould, Paez